## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

I, Michael Schmitt, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Environmental Protection Agency Criminal Investigation Division (EPA-CID), Cleveland Resident Office since July 2019. I am also a Task Force Officer (TFO) detailed to the Federal Bureau of Investigation (FBI) since October 2024. As an FBI TFO, I am currently assigned to the FBI Greater Cleveland Complex Crimes Task Force to investigate individuals and/or criminal enterprises engaged in criminal offenses. Prior to my employment with EPA-CID, I was a Special Agent with the Naval Criminal Investigative Service (NCIS) for four years. Prior to NCIS, I served as a Military Police Commissioned Officer in the United States Army for four years. In these capacities, I have conducted criminal investigations involving environmental crimes, firearms/explosives, narcotics, sexual crimes, fraud against the United States, mail/wire fraud, conspiracies, and other offenses.

2. As part of my duties as an EPA-CID Special Agent and FBI TFO, I investigate criminal violations of environmental and other federal laws. I have training and experience in interviewing and interrogation techniques, arrests, search and seizure, search warrant applications, and various other proceedings. While conducting investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, and executing search and/or arrest warrants.  I have been an Affiant of and participated in the execution of multiple federal search warrants.

3. Your Affiant submits this affidavit in support of an application for an arrest warrant for Valentin VELICU, also known ("AKA") GRASU AKA YANIS KARAGUNIS who has

1

violated 18 U.S.C. § 1349 - Conspiracy to commit Wire Fraud and Mail Fraud, 18 U.S.C. § 1029(b)(2) - Conspiracy to Commit Access Device Fraud, 18 U.SC. § 1028(a)(7) and (f) - Conspiracy to Commit Identity Theft, and 18 U.S. Code § 641 and 2 - Sale or receipt of stolen government monies (henceforth "TARGET OFFENSES").

4. The statements contained in this affidavit are based on my personal observations as well as information developed by other Special Agents of the FBI, United States Department of Agriculture (USDA) Office of Inspector General, Homeland Security Investigations (HSI), United States Secret Service (USSS), United States Department of State Bureau of Diplomatic Security (DS), and others who aided in this investigation. Your Affiant is thoroughly familiar with the information contained in this affidavit and the referenced investigation that began in October 2025. Likewise, any information pertaining to vehicles and registrations, personal data on subjects, and record checks, has been obtained from various databases to include Law Enforcement Automated Data System (LEADS), National Crime Information Center (NCIC), LexisNexis, and others.

5. Since this affidavit is being submitted for the limited purpose of supporting the application in this matter, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe VELICU violated 18 U.S.C. § 1349 - Conspiracy to commit Wire Fraud and Mail Fraud, 18 U.S.C. § 1029(b)(2) - Conspiracy to Commit Access Device Fraud, 18 U.SC. § 1028(a)(7) and (f) - Conspiracy to Commit Identity Theft, and 18 U.S. Code § 641 and 2 - Sale or receipt of stolen government monies.

**RELIABILITY OF CONFIDENTIAL SOURCE INFORMATION**

6. During the investigation, law enforcement agents utilized two confidential sources (hereby referred to as "CS-1" and "CS-2") to further the investigation into Valentin VELICU,

Co-Conspirator 1 (hereby referred to as "CC-1") and Co-Conspirator 4 (hereby referred to as "CC-4"), and other members of a Romanian Organized Crime (ROC) group. Some of the information from the confidential sources has been outlined in this affidavit. Information provided by CS-1 and CS-2 has been corroborated to the extent practicable through including, but not limited to, consensually recorded conversations, conversations with other law enforcement officers, and review of other law enforcement investigative reports and databases as well as applicable records maintained by private entities.

7.      CS-1 has provided information to the FBI since 2020. CS-1 receives monetary compensation for providing information and services. CS-1 does not have a criminal history in the United States but does have a criminal record in a foreign jurisdiction. CS-1's cooperation is not motivated to alter or minimize this conviction. The information provided by CS-1 has proven reliable through independent verification when possible to do so. Your Affiant does not have any reason to believe the information provided by CS-1 was false. Therefore, your Affiant believes that CS-1 is reliable.

8.      CS-2 has provided information to the FBI since 2025. CS-2 receives monetary compensation for providing information and services. CS-2 has a limited criminal history of misdemeanors for traffic infractions and one instance of domestic violence. The information provided by CS-2 has proven reliable through independent verification when possible to do so. Your Affiant does not have any reason to believe the information provided by CS-2 was false. Therefore, your Affiant believes that CS-2 is reliable.

**PROBABLE CAUSE**

**Terminology & Definitions**

9.      The USDA administers the Supplemental Nutrition Assistance Program ("SNAP") through its Food and Nutrition Service ("FNS"). SNAP is a federally funded assistance program designed to help low-income individuals and families purchase food. In Ohio, SNAP public assistance benefits are loaded to an account that a qualified recipient accesses by means of an access card, similar to a debit or credit card, called the Ohio Electronic Benefit Transfer ("EBT") card. All states maintain SNAP programs that operate in a substantially similar manner, including California.

10.      Temporary Assistance to Needy Families ("TANF") is a federally funded, state-run cash-assistance program for eligible families. TANF benefits are typically delivered via the same EBT card as SNAP benefits. Each EBT card has a unique EBT number that is encoded on the card. The recipient is also given a unique PIN as a security feature. When the EBT card is swiped at a POS register, the user selects EBT (as opposed to credit or debit), enters the PIN and the funds are electronically debited from the recipient's account and credited to the retailer's account.

11.      The Ohio EBT system is operated through a contract between the USDA-FNS and the State of Ohio. The State of Ohio maintains a primary service contract with Conduent, an American business services provider, to process EBT accounts. Conduent's primary data center is located in Sandy, Utah.

12.      Many other states have similar contracts between the USDA-FNS and a processor. A large number of states, including California, utilize Fidelity National Information Services

4

("FIS"), to process EBT accounts. FIS' is headquartered in 347 Riverside Avenue, Jacksonville, Florida.

13. A skimming device is a small device that can be attached to a card reader to capture credit card, debit card, or EBT card information. When a card passes over the skimming device, payment and personal information are captured from the magnetic stripe on the back of the card and internally stored on the device. PINs of the cards are often captured, nullifying the built-in security feature of the EBT accounts.

14. POS skimming is a form of financial fraud where criminals install hidden skimming devices on payment terminals in locations such as retail stores, grocery stores, and gas stations to steal payment card information. The devices are often designed to blend seamlessly with the legitimate payment terminals, and victims usually do not realize their information has been compromised until fraudulent charges appear on statements.

15. EBT cards are a prime target for POS skimming due to several key vulnerabilities. Unlike traditional credit and debit cards, which have largely transitioned to chip or tap-to-pay technology, EBT cards still rely on a magnetic stripe for transactions. This vulnerability makes them more susceptible to skimming, as criminals can easily capture the card's data when it is swiped at a compromised payment terminal. Additionally, EBT cards typically do not have the same fraud protections as standard bank-issued cards. Many card holders do not receive real-time fraud alerts or have the ability to quickly freeze their accounts. Because benefits are distributed on a fixed schedule, criminals can install skimming devices during the time of the month that cards are in high use.

16. Finally, EBT cards are attractive targets for fraud schemes acquiring account information through skimmers because the accounts are refilled at predictable times by federal

5

funding. Thus, criminal fraudsters will often time thefts or exploits to dates money arrives in the account or will request balance checks from co-conspirators to see if the card is worth exploiting. Because of this, the balance checks often provide current balances, the amount in an account a fraudster can steal through multiple transactions that drain an account, and "future balances," which reflect what the replenishment amount will be.

### Investigation Background

17.     The FBI and other agencies are investigating ROC groups operating in California and throughout the United States. Co-Conspirator 3 ("CC-3") leads one organization and directs several individuals, including CC-4, to place skimming devices on POSs and ATMs to extract EBT and card data. Once the devices are placed, the technology captures date and location of purchase and card details, including pin numbers, from each victim who inserts a card into the POS. VELICU is a known manufacturer and supplier of skimming devices, including to CC-3's ROC.

18.     To extract the data, ROC actors visit the stores or ATMs where the skimmer was placed. Using Bluetooth[1] or other means, the actor will extract all card data onto a handheld device. Based on my experience and conversations with other law enforcement personnel, Affiant knows actors will check the balance of the skimmed EBT cards by either calling the state of which the EBT benefits belong or by paying other criminal actors to check the balances for them. The ROC actors will deplete the funds themselves or sell the EBT accounts for profit.

---

[1] Bluetooth is a standard for the short-range wireless interconnection of mobile phones, computers, and other electronic devices.

### *Skimmer Placement*

19.      On or about February 5, 2026, CS-1 informed FBI Personnel CC-1 traveled to Sacramento, California, to deliver skimming devices to CC-4 for placement on POSs in the area. CS-1 described CC-1 as the person who decrypts data from skimmers and delivers skimmers to CC-3's teams.

20.      On or about February 5, 2026, CS-1 informed FBI personnel CC-4 placed a skimming device on a self-checkout POS at a Raley's grocery store located at 1601 West Capital Avenue, Sacramento, California. On February 5, 2026, Raley's loss prevention staff recovered one skimming device on the self-checkout POS. A Raley's employee, after reviewing surveillance video from February 5, 2026, and other dates when skimmers were placed in Raley's stores, notified FBI personnel that CC-4 was a known subject to the grocery store chain.

21.      This identification was based, in part, from video created from approximately July 15, 2024, to July 22, 2024, in which Raley's surveillance footage captured a male, positively identified by the FBI as CC-4 based on previous records, placing five skimming devices during five different grocery store visits in the Sacramento, California area. Raley's recovered all five skimming devices. The following are two photos of surveillance footage of CC-4 placing skimming devices on POSs, July 16, 2024, and July 17, 2024, respectively:



22.     Additionally, on or about December 12, 2025, Raley's security systems identified video of CC-4 visiting the store and utilizing a self-checkout POS. After CC-4 exited the store, Raley's employees recovered a skimming device found on the POS CC-4 used. In total, from 2024 to present, approximately seven skimming devices were placed by CC-4 at Raley's grocery stores. Raley's employees removed all skimmers placed on the POSs.

23.     On or about February 5, 2026, CS-1 informed FBI personnel another member of the ROC, CC-1, entered the same Sacramento, California, Raley's grocery store as CC-4. CC-1 visited the store to extract data and to remove the skimming device if it was not working properly. On or about February 24, 2026, Raley's loss prevention personnel confirmed to FBI personnel that CC-1 entered 1601 West Capital Avenue, Sacramento, California, on February 5, 2026, in the afternoon. Below is an image of CC-1's entrance to the Raley's location:



24.     Your Affiant knows it is common for one actor to install the device and for another actor to ensure the device is working. After some time, someone from the ROC will visit the store to extract the data. Affiant knows ROC actors avoid visiting the same location more than once.

25.     On or about February 4, 2026, employees of a 7-11 located at 500 Auburn Ravine Road, Auburn, California, found and removed a skimming device placed on a POS. After reviewing surveillance footage acquired by Special Agents of the USSS, FBI personnel observed an individual matching CC-4 description place a skimming device on a POS while standing at the checkout counter. Below is an image of the skimmer placement:

9



26.     On or about February 5, 2026, USSS Agents recovered a skimming device at a 7-11 located at 6882 Sunrise Boulevard, Citrus Heights, California. After reviewing surveillance footage, FBI personnel observed an individual matching CC-4 description place a skimming device on a POS while standing at the checkout counter. Below is an image of the skimmer placement:



27.     On or about February 5, 2026, USSS Agents recovered a skimming device at Circle K located at 7796 Sunrise Boulevard, Citrus Heights, California. After reviewing surveillance footage, FBI personnel observed an individual matching CC-4 description remove a skimming device from his pocket and, when the cashier was distracted, place a skimming device on a POS while standing at the checkout counter. Below is an image of the skimmer placement:



28.     On or about February 15, 2026, CS-1 conducted a consensual recording of CC-1 delivering skimmers developed by VELICU to CC-4 in California.

29.     According to CS-1, on or about February 16, 2026, CC-4 placed skimming devices at four 7-Elevens around San Francisco, California. On or about February 21, 2026, CS-1 informed your Affiant that CC-1 and VELICU visited three locations where CC-4 placed skimmers. According to CS-1, the devices were not on the POSs. On or about February 21, 2026, CC-4 checked where he placed a skimmer in a 7-Eleven located in San Bruno, California. According to CS-1, CC-4 removed the skimmer. The device had two skimmed accounts. CC-4 provided the skimmer to VELICU.

30.     On or about February 18, 2026, CS-1 provided images of an ATM skimmer developed by VELICU. According to CS-1 and consensual recordings, VELICU is a developer and supplier of skimming devices for POSs and ATMs. On or about February 19, 2026, CC-4 installed the below ATM skimmer into a Bank of America ATM in Berkeley, California. However, according to CS-1, the ATM malfunctioned, and CC-4 uninstalled the device. On or about February 20, 2026, CC-4 re-installed the skimming device on a different Bank of America ATM located in San Francisco, California.

11



### *Sales of EBT Accounts*

31.     On or about February 3, 2026, CS-1 informed FBI personnel that CC-4 was selling skimmed EBT account data in the form of a text file. Through the CS-1, CC-4 sold approximately thirteen EBT accounts with estimated balances and the cards' pin numbers to FBI personnel posing as CS-1's contact. On or about February 6, 2026, USDA personnel swiped the EBT accounts through an FBI-USDA Ohio POS connected to an FBI controlled bank account. Based on information provided by FIS, a processing company for EBT payments, at least one card was reported stolen.

### *Balance Checks*

32.     On or about January 31, 2026, CC-4 provided CS-1 with text files of skimmed EBT cards acquired from CC-3. CS-1 told CC-4 CS-1's contact could provide balance checks for the cards. CC-4 uploaded a text file with approximately 158 stolen California EBT cards to a

mail.com account and provided the log-in credentials to CS-1 for CS-1's contact to check the account balances.

33.     FBI personnel, functioning as CS-1's contact, logged into the mail.com account to download the text file. Your Affiant reviewed screenshots taken of the mail.com during the FBI personnel's log-in. The inbox only displayed two emails: a welcome email and the email with the text file. It appeared recently opened and no personal information associated to CC-4 was found.

34.     FBI personnel accessed the file and shared the text file to employees of FIS, a processor for EBT benefits, to query card account balances. For the 158 cards, current balances at that time were $16,795.31 for SNAP and $239.61 for cash. Future benefits for the 158 cards were $49,144.00 SNAP and $21,135.00 cash. FIS shared the account balances with FBI personnel. FBI personnel uploaded the text file into the mail.com account provided to CS-1 by CC-4. CS-1 informed FBI personnel that CC-4 successfully accessed the data.

35.     On or about January 31, 2026, CC-4 uploaded a new text file with 379 California EBT to mail.com for CS-1's contact to check account balances. CS-1 told FBI personnel the accounts were provided from skimmers controlled by CC-3. FBI personnel accessed the mail.com email account and downloaded the text file. FBI personnel shared the text file to FIS for account checks. The current balances at that time were $6,848.93 for SNAP and $625.71 for cash. Future benefits for the 379 cards were $64,430.10 SNAP and $15,153.00 cash. CS-1 informed FBI personnel that CC-4 successfully retrieved the data.

36.     On or about February 1, 2026, CS-1 informed FBI personnel that CC-4 created a new yahoo email. CC-4 provided the email's log-in credentials to CS-1 so CS-1 could share the text file to CS-1's contact for the purpose of EBT account balance checks. Using the

provided credentials, FBI personnel logged into the Yahoo email. Your Affiant reviewed screenshots from the Yahoo account. In the inbox, there was a Yahoo welcome email and an advertisement from TurboTax. Additionally, there was an email labeled "me". FBI personnel accessed the email "me" and downloaded a text file with approximately 379 EBT account card numbers. According to CS-1, the text file was provided to CC-4 by CC-3.

37. FBI personnel shared the text file to FIS for account balance checks. The current balances at that time were $13,483.39 for SNAP and $6,037.36 for cash. Future benefits for the 379 cards were $105,962.10 SNAP and $7,858.00 cash. FIS provided account balance checks to FBI personnel who uploaded them into the Yahoo email. CS-1 informed FBI personnel that CC-4 successfully retrieved the data.

38. Employees of FIS analyzed card transaction activity of the EBT accounts that were balance queried. Based on their analysis, approximately 9,861 transactions were conducted for approximately 916 unique EBT accounts. FBI and USDA personnel who reviewed the FIS data observed, for example, the same card being used to withdraw TANF from the same ATM within a short amount of time. Affiant knows ROC actors will often stand at an ATM and attempt multiple withdrawals until the card no longer works or is depleted.

39. On or about February 23, 2026, CS-1 reported to your Affiant that VELICU provided CC-4 a link to a file exchange website with a file containing 100 California EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 23, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file of accounts to FIS for balance checks.

14

40.     CC-4 paid CS-1's[2] contact via cryptocurrency. Based on FBI personnel's review of the blockchain, CC-4 utilized a CashApp account.

41.     On or about February 24, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current balances at that time were $5,357.87 for SNAP and $803.38 for cash. Future benefits for the 100 cards were $38,567.00 SNAP and $33,391.54 cash.

42.     On or about February 23, 2026, CS-1 reported to your Affiant that VELICU provided CC-4 a link to a file exchange website with a file containing 54 California EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 24, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file of accounts to FIS for balance checks. On or about February 24, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current balances at that time were $1,816.80 for SNAP and $293.80 for cash. Future benefits for the 54 cards were $18,332.00 SNAP and $25,110.00 cash.

43.     On or about February 24, 2026, CS-1 reported to your Affiant that VELICU provided CC-4 a link to a file exchange website with a file containing 57 California EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 24, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file

---

[2] CC-4 sent cryptocurrency to an FBI controlled cryptocurrency wallet.

of accounts to FIS for balance checks. On or about February 25, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current balances at that time were $3,049.10 for SNAP and $150.60 for cash. Future benefits for the 57 cards were $15,750.00 SNAP and $18,076.99 cash.

44.     On or about February 25, 2026, CS-1 reported to your Affiant that CC-3 provided CC-4 a link to a file exchange website with a file containing 361 EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 25, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file of accounts to FIS for balance checks. On or about February 25, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current balances at that time were $20,991.30 for SNAP and $1505.25 for cash. Future benefits for the 361 cards were $104,371.00 for SNAP and $45,675.00 for cash.

45.     On or about February 26, 2026, CS-1 reported to your Affiant that VELICU provided CC-4 a link to a file exchange website with a file containing 114 EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 26, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file of accounts to FIS for balance checks. On or about February 27, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current

16

balances at that time were $4,486.25 for SNAP and $484.26 for cash. Future benefits for the 114 cards were $27,346.00 for SNAP and $25,499.85 for cash.

46.     On or about February 26, 2026, CS-1 reported to your Affiant that VELICU provided CC-4 a link to a file exchange website with a file containing 189 EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 26, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file of accounts to FIS for balance checks. On or about February 28, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current balances at that time were $6,264.10 for SNAP and $1,633.20 for cash. Future benefits for the 189 cards were $31,074.00 for SNAP and $26,575.47 for cash.

47.     On or about February 27, 2026, CS-1 reported to your Affiant that CC-1 provided CC-4 a link to a file exchange website with a file containing 54 EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 27, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file of accounts to FIS for balance checks. On or about February 28, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current balances at that time were $5,320.84 for SNAP and $105.97 for cash. Future benefits for the 54 cards were $11,068.00 for SNAP and $9,584.00 for cash.

48.     On or about February 28, 2026, CS-1 reported to your Affiant that CC-3 provided CC-4 a link to a file exchange website with a file containing 393 EBT accounts. CC-4 provided the link to CS-1 for CS-1 to utilize contacts to check the balances of the cards. CS-1 provided the link to your Affiant. On or about February 28, 2026, FBI personnel utilized the link to download the text file. FBI personnel then provided the text file of accounts to FIS for balance checks. On or about February 28, 2026, FIS provided your Affiant the completed files with the balance checks. FBI personnel uploaded a text file of the balance checks to the file exchange website and provided the link to CS-1. CS-1 shared the link to CC-4. The current balances at that time were $19,802.94 for SNAP and $6,153.45 for cash. Future benefits for the 393 cards were $111,990.00 for SNAP and $81,428.72 for cash.

49.     Employees of FIS analyzed card transaction activity spanning February 24, 2026, to March 12, 2026, of the EBT accounts that were balance queried. Based on their analysis, approximately 8,712 transactions were conducted for approximately 981 unique EBT accounts that were checked and provided to CC-4. Based on the data provided by FIS, CC-4 requested CS-2 to transact at least one California EBT card number that was balanced checked through the FBI-controlled POS. Only account numbers provided by CC-4 and co-conspirators were ran through the POS.

50.     FBI personnel who reviewed the FIS data observed, for example, several cards being used to withdraw TANF from the same ATM within a short amount of time. Affiant knows ROC actors will often stand at an ATM and attempt multiple cards until the cards are depleted or no longer work.

51.     According to CS-1, VELICU and CC-3 sent cryptocurrency to CC-4 for CC-4 to pay CS-1's contact for the account balance checks[3].

### *Northern District of Ohio Schemes*

52.     On or about February 21, 2026, CS-1 conducted a consensual recording in which CC-1 and VELICU discussed with CS-1 skimming operations, including the manufacturing of skimming devices. VELICU discussed he/she would mail skimming devices to Ohio for the purpose of placement on POSs in the Northern District of Ohio by CS-1 and CC-4.

53.     On or about February 22, 2026, CC-4 departed California, arriving in Ohio on or about February 25, 2026.

54.     According to CS-1, on or about February 26, 2026, CC-4 visited multiple convenience and grocery stores in the Northern District of Ohio to identify make and model of POSs. According to CS-1, CC-4 sent photos of POSs to CC-1 via an encrypted messaging application.

55.     On or about February 26, 2026, CS-1 provided a mailing address to CC-4. According to CS-1, CC-4 provided the mailing address to CC-1. The address provided was in Northern District of Ohio and is known to your Affiant.

56.     On or about February 27, 2026, CS-2 met CC-4 in the vicinity of Cleveland, Ohio. During the meeting, CS-2 and CC-4 discussed a POS device and that CS-2 would allow CC-4 to run stolen EBT card through the POS.

57.     On or about February 28, 2026, CC-1 visited a United States Postal Services ("USPS") and mailed a package from California to Ohio. According to CS-1, the package

---

[3] CC-4 sent cryptocurrency to an FBI controlled cryptocurrency wallet.

contained skimming devices and fraudulent identification documents for CC-4. Below is a photo of CC-1 mailing the package:



58. On or about March 2, 2026, the package, bearing tracking number 9505 5162 2005 6059 6014 78, was intercepted in Ohio by a USPS Postal Inspector. On or about March 2, 2026, a search warrant was obtained from the Honorable Magistrate Judge Jonathan D. Greenberg for the contents of the package.

59. On or about March 3, 2026, the package, bearing tracking number 9505 5162 2005 6059 6014 78, was opened by Affiant and a Postal Inspector. The packaged contained but not limited to three suspected skimming devices, a card loader, charging device, double sided tape, black iPhone, Belgian passport, Belgian driver's license, international driver's license, and Costco card. Based on Affiant's training, experience, and conversations with other law enforcement personnel, your Affiant is aware the skimming devices would be used by individuals attempting to steal data from POS devices. Photographs of some of the skimming equipment are shown below:

20

  

60.     On or about March 3, 2026, Affiant reviewed the Belgian Passport, Belgian driver's license, international driver's license, and Costco card. All the aforementioned documents contained the name Morgan Anderson. The photograph on all the identification documents is consistent with CC-4. The identification documents in the package are consistent with those previously seen by CS-1. Based on Affiant's training, experience, and conversations with other law enforcement personnel, your Affiant is aware individuals who utilize fraudulent forms of identification will often mail them to avoid being caught by law enforcement with the fraudulent documents in their possession during travel. Photographs of some of the identifications are shown below:

  

61.     On or about March 3, 2026, FBI personnel resealed the package and provided the package to CS-2. CS-2 delivered the package to CC-4 at a location known to your Affiant. CC-4 opened the package outside of view from CS-2. CS-1 confirmed to Affiant that a

21

device, called a Magnetic Stripe Card Reader ("MSR"), was included in the package. A MSR is used to read and write data on magnetic strips cards such as debit and credit cards.

62.     On or about March 3, 2026, based on consensual recordings and CS reporting, CC-4 attached a MSR to an HP laptop. CS-2 observed a text file opened on the HP screen containing card information. CC-4, utilizing a cellular device, called telephone numbers to check balances on EBT cash and EBT food cards. After each card balance was checked, CC-4 swiped a card through the MSR connected to his laptop. CC-4 then handed the card to CS-2 to swipe through the POS to withdraw money and re-check balances. Two successful transactions were made on the POS. CC-4 told CS-2 to return at a later date to swipe additional cards through CS-2's POS[4].

63.     According to CS-1, on or about March 3, 2026, CC-4 placed a skimmer at a 7-Eleven located in Toledo. On or about March 5, 2026, CC-4 placed skimmers received from CC-1 and VELICU at 7-Eleven located in Maple Heights, Ohio, and at Broadway Food Center located in Toledo, Ohio. All addresses of placed skimmers are known to your Affiant. According to CS-1, and the agreement between CC-4 and co-conspirators, Ohio card data would only be run through CS-2's POS[5].

64.     On or about March 4, 2026, CS-2 met CC-4 at a location known to your Affiant. Your Affiant reviewed footage from a consensual recording and identified CC-4 utilizing a laptop and multiple cellular devices. CC-4 provided cards to CS-2 to swipe through a POS. Only two cards were successful. At the end of the meeting, CC-4 provided CS-2 with cards and asked CS-2 to run them through the POS of his/her own. CC-4 allowed CS-2 to take a

---

[4] POS is connected to an FBI-controlled bank account.

[5] CS-1, when possible, manipulated the placed skimming devices so the data did not collect properly, rendering the numbers incomplete and unusable.

photo of the laptop screen with card and pin numbers. During the meeting, CS-1, CS-2, and CC-4 discussed an FNS authorization code and how to attach it to a new POS. CC-4 called VELICU to discuss CS-2 sending photos of POSs for the purpose of manufacturing correct skimmers.

65.     According to CS-1, on or about March 5, 2026, CC-1 and VELICU mailed a second package to a location in the Northern District of Ohio, which is known to your Affiant, with skimming devices assembled consistent with POS images CC-4 sent to CC-1 and VELICU.

66.     On or about March 9, 2026, the package, bearing tracking number 9505 5138 0681 6064 7695 62 was intercepted in Ohio by a USPS Postal Inspector. On or about March 9, 2026, a search warrant was obtained from the Honorable Magistrate Judge Jonathan D. Greenberg for the contents of the package.

67.     On or about March 9, 2026, the package, bearing tracking number 9505 5138 0681 6064 7695 62, was opened by Affiant and a Postal Inspector. The package contained three skimming devices, a MSR, and a California EBT card. Photographs of the package's contents are below:

23





68.     On or about March 5, 2026, CS-1 conducted a consensual recording in which CC-1 and VELICU discussed purchasing a FNS authorization code from CS-2 and utilizing another ROC actor (hereby referred to as Co-Conspirator 5 ("CC-5")) to clone the code to

multiple POSs. The group discussed splitting money earned equally. Your Affiant knows a POS with an FNS authorization code is attached to a bank account and can run EBT cards as well as debit and credit cards.

69. On or about March 5, 2026, CS-1 conducted a consensual recording in which CC-1 and VELICU discussed manufacturing and supplying skimming devices to criminal actors. According to CS-1, VELICU sells each skimming device for $2,500. On a video call, VELICU showed a workshop in his residence with several tools to manufacture skimming devices as well as multiple skimming devices manufactured by himself. VELICU also showed software and explained it as a tool to clear up errors in a dataset from skimmed accounts. VELICU stated CC-5 created the software.

70. On or about March 6, 2026, according to a consensual recording between CS-1 and VELICU, VELICU and CS-1 discussed CS-1 acquiring VELICU a legal driver's license. VELICU stated not to utilize his true name as he violated his parole. On or about March 6, 2026, VELICU provided CS-1 with height, weight, hair color, and other information to use on an application for a driver's license. According to a consensual recording conducted on or about February 22, 2026, VELICU discussed the need for a legal driver's license and passport to freely travel between the United States and Romania. VELICU discussed previous illegal border crossings into the United States.

71. According to CS-1 reporting, on or about March 9, 2026, CC-4 removed the skimmer placed at Broadway Food Center in Toledo, Ohio because it was not collecting data correctly. On or about March 10, 2026, According to CS-1 reporting, on or about March 10, 2026, CC-4 placed three skimmers received in the mail from CC-1 and VELICU. CC-4 placed the skimmers at gas stations located in Cleveland and Toledo, Ohio, as well as a re-

installed a skimmer at Broadway Food Center in Toledo, Ohio. All locations of placed skimmers are known to your Affiant.

72.     On or about March 10, 2026, VELICU sent a file exchange link to CS-1 containing 19 New York EBT accounts, their pin numbers, and expected account balances. The 19 cards had a listed SNAP balance as approximately $6,824 and an estimated EBT cash value of approximately $2,818. VELICU asked CS-1 to run the cards through CS-2's POS. USDA personnel conducted transactions of the cards on the POS. Only 4 of the 19 cards worked, resulting in the withdrawal of $2,473.60.

73.     On or about March 9, 2026, CS-1 conducted a consensual recording between CS-1, CC-4, and CC-3 in which CC-3 and CC-4 discussed skimming operations and the manufacturing of skimming devices as well as CC-3 mailing skimming devices to Ohio.

74.     On or about March 17, 2026, CS-1 conducted a consensual recording between CS-1, VELICU, and CC-5. The group discussed skimming operations, manufacturing devices, and a software CC-5 developed that allows a user to sift through data to identify duplicate cards as well as know the battery life of a skimming device.

75.     On or about March 17, 2026, CS-1 informed your Affiant that CC-3 mailed a package containing skimming devices. On or about March 18, 2026, FBI personnel obtained a search warrant from the Honorable Magistrate Judge Reuben J. Sheperd for the contents of the package shipped to "Anderson Morgan". On or about March 19, 2026, your Affiant executed the search warrant on the package, observing two suspected skimming devices within the package.

*Valentin VELICU's Criminal History*

76.    On or about February 25, 2025, your Affiant reviewed law enforcement database records revealing VELICU had arrest and/or convictions throughout the United States. His criminal recorded including, among other violations, alien removal, grand theft, and unauthorized use of personal identifying information.

77.    On or about March 2, 2026, Romanian law enforcement partners informed your Affiant that VELICU's criminal history consists of "illegal operations with devices or software and creation of an organized crime group – 2018, Romania".

## CONCLUSION

78.    Based on the above information, I respectfully submit that there is probable cause to believe that Valentin VELICU committed violations of 18 U.S.C. § 1349 - Conspiracy to commit Wire Fraud and Mail Fraud, 18 U.S.C. § 1029(b)(2) - Conspiracy to Commit Access Device Fraud, 18 U.SC. § 1028(a)(7) and (f) - Conspiracy to Commit Identity Theft, and 18 U.S. Code §§  641 and 2 - Sale or receipt of stolen government monies.

79.     Your Affiant respectfully requests that the Court issue an arrest warrant for Valentin VELICU.

Respectfully submitted,

Michael Schmitt
Special Agent: U.S. EPA CID
Task Force Officer: FBI

Sworn to via Facetime after submission by reliable electronic means. Fed. R. Crim. P. 3, 4(d), and 4.1.



James E. Grimes Jr., United States Magistrate Judge

March 19, 2026

_____
DATE