IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FILED**

MAR 3 1 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **I N D I C T M E N T** |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO. **1 :26 CR 0 0 1 4 7** |
| IONUT ILIE, | ) |
|    aka IONUT DORABANTU, aka | ) Title 18, United States Code, |
|    MORGAN ANDERSON, aka IONUT | ) Sections 641, 1028(a)(7) and (f), |
|    CRACIUN-CERCEL, aka LUKAS | ) 1029(a)(4), (b)(2) and |
|    HLADKY, aka FREDERIK JUHL, | ) (c)(1)(a)(ii), 1349, 1546, and 2; |
| CONSTANTIN EUGEN ION, | ) Title 8, United States Code, |
|    aka PIRANHA | ) Section 1326(a)(1) and (b)(3) |
| VALENTIN VELICU, | ) |
|    aka GRASU, aka YANIS | ) |
|    KARAGUNIS, | ) |
| DRAGOS GEORGHIE VASILE, | ) **JUDGE BARKER** |
| MARIAN ALEXANDRU SEMPLICAN, | ) |
| | ) |
| Defendants. | ) |

INTRODUCTION AND GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.    In the Northern District of Ohio, and elsewhere in the United States of America, the Defendants IONUT ILIE aka IONUT DORABANTU, aka MORGAN ANDERSON, aka IONUT CRACIUN-CERCEL, aka LUKAS HLADKY, aka FREDERIK JUHL; CONSTANTIN EUGEN ION aka PIRANHA; VALENTIN VELICU aka GRASU, aka YANIS KARAGUNIS; DRAGOS GEORGHIE VASILE; and MARIAN ALEXANDRU SEMPLICAN, engaged in a scheme to defraud recipients of Federal assistance program monies by manufacturing and placing "skimming devices" that, when placed over legitimate terminals used to process electronic benefit card transactions without the knowledge or consent of the victim, victim

location or state and federal agency, fraudulently and surreptitiously collected victims' user credentials, account information, account balance, and account deposit information.

2. ILIE, ION, VELICU, VASILE, and SEMPLICAN, collected victims' data using wireless devices to avoid detection and process the stolen data through terminals under their control to convert the benefit funds for their personal use.

3. The Defendants were all citizens of Romania.

4. IONUT ILIE, aka Ionut Dorabantu, aka Morgan Anderson, aka Ionut Craciun-Cercel, aka Lukas Hladky, aka Frederik Juhl, was a citizen of Romania and not legally present in the United States of America;

5. CONSTANTIN EUGEN ION, aka Piranha, was a citizen of both Romania and Mexico.

6. VALENTIN VELICU, aka Grasu, aka Yanis Karagunis, was a citizen of Romania and not legally present in the United States of America.

7. DRAGOS GEORGHIE VASILE, was a citizen of Romania and present in the United States of America on an immigrant visa which was obtained through fraud.

8. MARIAN ALEXANDRU SEMPLICAN was a citizen of Romania and was present in the United States of America and has overstayed his visa.

Federal Assistance Programs Terminology and Definitions

9. The USDA administers the Supplemental Nutrition Assistance Program ("SNAP") through its Food and Nutrition Service ("FNS"). SNAP is a federally funded assistance program designed to help low-income individuals and families purchase food.

2

10.     In Ohio, SNAP public assistance benefits are loaded to an account that a qualified recipient accesses by means of an access card, similar to a debit or credit card, called the Ohio Electronic Benefit Transfer ("EBT") card.

11.     All states maintain SNAP programs that operate in a substantially similar manner, including California.

12.     Temporary Assistance to Needy Families ("TANF") is a federally funded, state-run cash-assistance program for eligible families.

13.     TANF benefits are typically delivered via the same EBT card as SNAP benefits. Each EBT card has a unique EBT number that is encoded on the card.

14.     The recipient is also given a unique PIN as a security feature. When the EBT card is swiped at a POS register, the user selects EBT (as opposed to credit or debit), enters the PIN and the funds are electronically debited from the recipient's account and credited to the retailer's account.

15.     The Ohio EBT system is operated through a contract between the USDA-FNS and the State of Ohio.

16.     The State of Ohio maintains a primary service contract with Conduent, an American business services provider, to process EBT accounts. Conduent's primary data center is located in Sandy, Utah.

17.     Many other states have similar contracts between the USDA-FNS and a processor. Many states, including California, utilize Fidelity National Information Services ("FIS"), to process EBT accounts. FIS is headquartered in Jacksonville, Florida.

18.     A "skimming device," or "skimmer," is a small device that can be attached to a card reader to capture credit card, debit card, or EBT card information. When a card passes over

3

the skimming device, payment and personal information are captured from the magnetic stripe on the back of the card and internally stored on the device. PINs of the cards are often captured, nullifying the built-in security feature of the EBT accounts.

19. "POS skimming" is a form of financial fraud where criminals install hidden skimming devices on point-of-sale payment terminals in locations such as retail stores, grocery stores, and gas stations to steal payment card information. The devices are often designed to blend seamlessly with the legitimate payment terminals, and victims usually do not realize their information has been compromised until fraudulent charges appear on statements.

20. EBT cards are a prime target for POS skimming due to several key vulnerabilities:

a. Unlike traditional credit and debit cards, which have largely transitioned to chip or tap-to-pay technology, EBT cards still rely on a magnetic stripe for transactions. This vulnerability makes them more susceptible to skimming, as criminals can easily capture the card's data when it is swiped at a compromised payment terminal.

b. Additionally, EBT cards typically do not have the same fraud protections as standard bank-issued cards. Many card holders do not receive real-time fraud alerts or have the ability to quickly freeze their accounts.

c. Because benefits are distributed on a fixed schedule, criminals can install skimming devices during the time of the month that cards are in high use.

d. Likewise, EBT cards and their accounts are refilled at predictable times by federal funding. Thus, criminal fraudsters will often time thefts or exploits to coincide with the dates money arrives in the account or will request balance checks from co-conspirators to see if the card is worth exploiting.

4

21.     Because of the regular timing of account replenishment, criminal groups operating POS skimming schemes often first conduct "balance checks" to determine current balances, which reflect the amount in an account a fraudster can steal through multiple transactions that drain an account, as well as "future balances," which reflect what the replenishment amount will be.

<u>Interstate Nexus of the Federal Assistance Programs</u>

22.     Although the USDA provides financial funding directly to each state directly for their individual assistance programs, most states use out-of-state banks and financial management companies to distribute, manage and control those funds.

23.     All communications related to fund disbursement and management, including but not limited to POS transactions, balance inquiries, account replenishment and account maintenance, occur using electronic signals sent over the Internet, wires, and telephone systems, all of which are means of interstate communication and commerce.

24.     For instance, EBT or ATM terminals used in the Northern District of Ohio to access funds held in assistance accounts of Ohio victims communicate via wires to accounts managed on servers owned by Conduent located in Utah.

25.     Likewise, terminals used in California access data controlled by FIS, headquartered in Florida.

<u>COUNT 1</u>
(Conspiracy to Commit Wire Fraud and Mail Fraud, 18 U.S.C. § 1349)

The Grand Jury charges:

26.     Paragraphs 1-25 are re-alleged and incorporated by reference herein.

27.     From on or about January 30, 2026 to on or about March 20, 2026, in the Northern District of Ohio and elsewhere, Defendants IONU ILIE aka IONUT DORABANTU,

5

aka MORGAN ANDERSON, aka IONUT CRACIUN-CERCEL, aka LUKAS HLADKY, aka FREDERIK JUHL; CONSTANTIN EUGEN ION aka PIRANHA; VALENTIN VELICU aka GRASU, aka YANIS KARAGUNIS; DRAGOS GEORGHIE VASILE; and MARIAN ALEXANDRU SEMPLICAN conspired with each other and others known and unknown to the Grand Jury to commit the following offenses:

a.     wire fraud, that is, having devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343; and

b.     mail fraud, that is, having devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did, for the purpose of executing and attempting to execute the scheme, knowingly cause to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

<u>Object and Purposes of the Conspiracy</u>

28.     The object of the conspiracy was to commit wire fraud and mail fraud. The goals of the conspiracy were, among other things, to obtain money and other things of value by using skimming devices to capture victims' public assistance account data which was used to fraudulently access and use victims' public assistance benefits.

6

## Manner and Means of the Conspiracy to Defraud

29.     It was part of the conspiracy that:

a.      Defendants manufactured and programmed skimming devices mimicking the appearance of legitimate Point of Sale (POS) terminals;

b.      Defendants developed and installed software on the skimming devices that collected victim account credentials, data and account information;

c.      Defendants delivered skimming devices in person or through the United States mail system;

d.      Defendants placed the fraudulent skimming devices in public locations where victims would unknowingly use them to process transactions using federal assistance program funds;

e.      Defendants used wireless and remote access enabled devices to collect the stored stolen data, and stored and transferred the data to Defendants via email and online file exchange services;

f.      Defendants accessed the stolen account data to validate the account information, activity, and balance;

g.      Defendants loaded stolen credentials and account data onto blank cards using a Magnetic Stripe Card Writer to make the data readable by a Point of Sale (POS) terminal;

h.      Defendants transferred and caused the transfer of funds contained in the accounts stolen from the victims' accounts to accounts controlled by Defendants;

i. Defendants transferred and caused the transfer of funds contained in the accounts stolen from the victims' accounts by Defendants by withdrawing funds and depleting funds at an ATM or controlled POS.

<u>Acts in Furtherance of the Conspiracy and the Scheme to Defraud</u>

30. In furtherance of the conspiracy and scheme to defraud, and to accomplish its goals, the following overt acts, among others, were committed in the Northern District of Ohio and elsewhere:

31. On or about February 5, 2026, ILIE received four skimming devices from VELICU and DRAGOS in Sacramento, California.

32. On or about February 4, 2026, ILIE placed a skimming device at a 7-11 located at 500 Auburn Ravine Road, Auburn, California.

33. On or about February 5, 2026, ILIE placed a skimming device on a self-checkout POS at a Raley's grocery store located at 1601 West Capital Avenue, Sacramento, California.

34. Between on or about July 15, 2024 and July 22, 2024, ILIE placed five skimming devices on POS machines in Raley's locations in the Sacramento, California, area.

35. On or about December 12, 2025, ILIE used a self-checkout POS.

36. On or about February 5, 2026, after ILIE left the Raley's store, VASILE entered the same Sacramento, California, store to extract data or remove the skimming device if it was not working properly.

37. On or about February 5, 2026, ILIE placed a fraudulent skimmer device at Circle K located at 7796 Sunrise Boulevard, Citrus Heights, California.

38. ILIE removed a skimming device from his pocket and, when the cashier was distracted, placed a fraudulent skimmer device on a POS while standing at the checkout counter.

8

39.    On or about February 15, 2026, VASILE delivered three skimming devices developed and constructed by VELICU to ILIE in California.

40.    On or about February 16, 2026, ILIE placed skimming devices at four 7-Elevens around San Francisco, California.

41.    On or about February 21, 2026, VASILE and VELICU visited three locations where ILIE previously placed skimming devices.

42.    On or about February 21, 2026, ILIE checked where he placed a skimming device in a 7-Eleven located in San Bruno, California, and then removed the skimming device.

43.    ILIE checked the skimming device, and learning it contained two skimmed accounts, provided the skimming device to VELICU.

44.    On or about February 18, 2026, VELICU took photographs of an ATM skimming device he recently developed and constructed.

45.    On or about February 19, 2026, ILIE installed an ATM skimming device into a Bank of America ATM in Berkeley, California, but the ATM malfunctioned, and ILIE removed the device.

46.    On or about February 20, 2026, ILIE re-installed the skimming device on a different Bank of America ATM located in San Francisco, California.

### *Balance Checks and Selling Stolen Accounts*

47.    On or about February 3, 2026, ILIE sold approximately thirteen EBT accounts, at least one of which was confirmed by USDA agents as a stolen account, with estimated balances and the cards' pin numbers to FBI personnel posing as a confidential source's (hereby referred to as "CS-1") contact.

48.     On or about January 31, 2026, ILIE uploaded files containing approximately 158 stolen California EBT cards acquired from ION to a mail.com account and provided the log-in credentials to CS-1 for CS-1's contact to check the account balances. The accounts contained balances of $16,795.31 for SNAP and $239.61 for cash, and future benefits of $49,144.00 SNAP and $21,135.00 cash.

49.     On or about January 31, 2026, ILIE uploaded a file provided by ION with 379 California EBT accounts to mail.com. The accounts contained balances of $6,848.93 for SNAP and $625.71 for cash, and future benefits of $64,430.10 SNAP and $15,153.00 cash.

50.     On or about February 1, 2026, ILIE uploaded a text file to a Yahoo email account containing approximately 379 EBT account card numbers provided by ION. Of those accounts, the current balances totaled $13,483.39 for SNAP and $6,037.36 for cash, and future benefits for the 379 cards were $105,962.10 SNAP and $7,858.00 cash.

51.     On or about February 23, 2026, VELICU provided a link to ILIE, via a messaging application, to a file exchange website with a file containing 100 California EBT accounts. The current balances at that time were $5,357.87 for SNAP and $803.38 for cash, and future benefits for the 100 cards were $38,567.00 SNAP and $33,391.54 cash.

52.     On or about February 23, 2026, VELICU provided ILIE, via a messaging application, a link to a file exchange website with a file containing 54 California EBT accounts. The current balances at that time were $1,816.80 for SNAP and $293.80 for cash, and future benefits for the 54 cards were $18,332.00 SNAP and $25,110.00 cash.

53.     On or about February 24, 2026, VELICU provided ILIE, via a messaging application, a link to a file exchange website with a file containing 57 California EBT accounts.

10

The current balances at that time were $3,049.10 for SNAP and $150.60 for cash, and the future benefits for the 57 cards were $15,750.00 SNAP and $18,076.99 cash.

54. On or about February 25, 2026, ION provided ILIE a link, via a messaging application, to a file exchange website with a file containing 361 EBT accounts. The current balances at that time were $20,991.30 for SNAP and $1505.25 for cash, and the future benefits for the 361 cards were $104,371.00 for SNAP and $45,675.00 for cash.

55. On or about February 26, 2026, VELICU provided ILIE a link, via a messaging application, to a file exchange website with a file containing 114 EBT accounts. The current balances at that time were $4,486.25 for SNAP and $484.26 for cash, and future benefits for the 114 cards were $27,346.00 for SNAP and $25,499.85 for cash.

56. On or about February 26, 2026, VELICU provided ILIE a link, via a messaging application, to a file exchange website with a file containing 189 EBT accounts. The current balances at that time were $6,264.10 for SNAP and $1,633.20 for cash, and future benefits for the 189 cards were $31,074.00 for SNAP and $26,575.47 for cash.

57. On or about February 27, 2026, VELICU provided ILIE a link, via a messaging application, to a file exchange website with a file containing 54 EBT accounts. The current balances at that time were $5,320.84 for SNAP and $105.97 for cash, and the future benefits for the 54 cards were $11,068.00 for SNAP and $9,584.00 for cash.

58. On or about February 28, 2026, ION provided ILIE a link, via a messaging application, to a file exchange website with a file containing 393 EBT accounts. The current balances at that time were $19,802.94 for SNAP and $6,153.45 for cash, and the future benefits for the 393 cards were $111,990.00 for SNAP and $81,428.72 for cash.

11

59.     From on or about February 24, 2026 to on or about March 12, 2026, the Defendants exploited, or attempted to exploit approximately 981 unique EBT accounts.

### ***Northern District of Ohio Schemes***

60.     On or about February 21, 2026, ILIE and VELICU discussed skimming operations, including the manufacturing of skimming devices. VELICU said that he would mail skimming devices to Ohio for the purpose of placement on POSs in the Northern District of Ohio by CS-1 and ILIE.

61.     Between on or about February 22, 2026, and February 25, 2026, ILIE traveled from California to the Northern District of Ohio to place skimming devices on POS terminals.

62.     On or about February 26, 2026, ILIE visited multiple convenience and grocery stores in the Northern District of Ohio to identify make and model of POSs.

63.     On or about February 26, 2026, ILIE sent photos of POSs to VELICU via an encrypted messaging application on his cellular telephone.

64.     On or about February 26, 2026, ILIE provided VELICU a mailing address in the Northern District of Ohio to which VELICU would mail skimming devices.

65.     On or about February 27, 2026, a confidential source (hereby referred to as "CS-2) met ILIE in the vicinity of Cleveland, Ohio, where they discussed a POS device that CS-2 would allow ILIE to run stolen EBT card through for current and future balance checks.

66.     On or about February 28, 2026, VASILE mailed a package from a United States Postal Services ("USPS") office in California to an address provided by ILIE in the Northern District of Ohio. The package contained three fraudulent skimming devices, a card loader, a device called a Magnetic Stripe Card Reader ("MSR") used to read and write data on magnetic strips cards such as debit and credit cards, a charging device, double sided tape, a black iPhone, a

12

Belgian passport in a false name and bearing ILIE's photograph, a Belgian driver's license in a false name and bearing ILIE's photograph, an international driver's license in a false name and bearing ILIE's photograph, and a Costco card in a false name and bearing ILIE's photograph.

67. On or about March 3, 2026, ILIE received the package in the Northern District of Ohio.

68. On or about March 3, 2026, ILIE attached the MSR to a laptop and opened a text file containing card information. ILIE then used a cellular telephone to call telephone numbers to check balances on EBT cash and EBT food cards. After each card balance was checked, ILIE swiped a card through the MSR connected to his laptop. ILIE then handed the card to CS-2 to swipe through the POS to withdraw money and re-check balances. Two successful transactions were made on the POS. ILIE told CS-2 to return at a later date so ILIE could swipe additional cards.

69. On or about March 3, 2026, ILIE placed a skimming device at a 7-Eleven located in Toledo, Ohio.

70. On or about March 5, 2026, ILIE placed skimming devices received from VELICU and DRAGOS at a 7-Eleven located in Maple Heights, Ohio, and at Broadway Food Center located in Toledo, Ohio.

71. On or about March 4, 2026, ILIE met CS-1 and CS-2. ILIE, using his laptop computer and at least one cellular device, checked card balances. ILIE then provided cards to CS-2 to swipe through a POS.

72. During the meeting, ILIE called VELICU to discuss CS-2 sending photos of POSs so that VELICU could manufacture fraudulent skimming devices that matched the POSs.

13

73.     At the end of the meeting, ILIE provided CS-2 with cards and asked CS-2 to run them through a POS. ILIE allowed CS-2 to take a photo of the laptop screen with card and pin numbers.

74.     On or about March 5, 2026, DRAGOS and VELICU mailed a second package to ILIE in the Northern District of Ohio via the United States Postal System. The package contained three fraudulent skimmer devices, a MSR, and a California EBT card.

75.     On or about March 5, 2026, VELICU, during a call with CS-1, claimed to sell each skimming device for $2,500 and showed a workshop in his residence with several tools to manufacture skimming devices as well as multiple skimming devices manufactured by himself. VELICU also showed software and explained it as a tool to clear up errors in a dataset from skimmed accounts. VELICU stated SEMPLICAN created the software.

76.     On or about March 6, 2026, VELICU asked CS-1 for help acquiring valid driver's license in a false name. During the conversation VELICU provided CS-1 with height, weight, hair color, and other information to use on an application for a fraudulent driver's license.

77.     During the same conversation, VELICU discussed the need for a legal driver's license and passport to freely travel between the United States and Romania in furtherance of this scheme and discussed previous illegal border crossings into the United States.

78.     On or about March 9, 2026, ILIE removed the skimming device placed at Broadway Food Center in Toledo, Ohio, because it was not collecting data correctly.

79.     On or about March 9, 2026, ION and ILIE discussed skimming operations and the manufacturing of skimming devices.

80.     During that same telephone conversation ILIE informed ION he will provide an address to ION, so ION could send additional fraudulent skimmer devices.

14

81. On or about March 10, 2026, ILIE placed three fraudulent skimmer devices received in the mail from DRAGOS and VELICU at gas stations located in Cleveland and Toledo, Ohio, and re-installed a fraudulent skimmer device at Broadway Food Center in Toledo, Ohio.

82. On or about March 10, 2026, VELICU provided a file exchange link, via messaging application, containing 19 New York EBT accounts, their pin numbers, and expected account balances. The 19 cards had a listed SNAP balance as approximately $6,824 and an estimated EBT cash value of approximately $2,818. From 4 of the 19 EBT cards that worked, VELICU caused $2,473.60 to be withdrawn from the cards.

83. On or about March 17, 2026, ION told ILIE he will mail skimming devices to ILIE in Ohio.

84. On or about March 17, 2026, ION mailed a parcel from a UPS store located in Fresno, California, to a UPS store located in Mentor, Ohio, containing two fraudulent skimming devices and addressed to a fictitious identification used by ILIE

85. On or about March 23, 2026, three defendants were found at their place of residence which contained a room that served as a workroom and workshop for developing, constructing and exploiting access devices. Included in the room, among other things, were faceplates for EBT machines, keypads, tape, wires, schematics for overlay devices, and other tools and components required to manufacture and construct illegal access devices and devices that can exploit information stored on access devices. Additionally, multiple fraudulent identifications were found within the residence for SEMPLICAN and VELICU.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
(Conspiracy to Commit Access Device Fraud, 18 U.S.C. § 1029(a)(4), (b)(2) and (c)(1)(a)(ii))

The Grand Jury further charges:

86.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-25 of this Indictment.

87.     From on or about January 30, 2026 to on or about March 20, 2026, in the Northern District of Ohio and elsewhere, Defendants IONU ILIE aka IONUT DORABANTU, aka MORGAN ANDERSON, aka IONUT CRACIUN-CERCEL, aka LUKAS HLADKY, aka FREDERIK JUHL; CONSTANTIN EUGEN ION aka PIRANHA; VALENTIN VELICU aka GRAS, aka YANIS KARAGUNIS; DRAGOS GEORGHIE VASILE; and MARIAN ALEXANDRU SEMPLICAN, knowingly and with intent to defraud, conspired to produce, traffic in, control and possess and possessed device-making equipment to wit; fraudulent EBT POS devices capable of obtaining, storing and transmitting account identifiers, credentials and account information, and said production, trafficking, control and possession affecting interstate and foreign commerce, in that funds provided from the United States Department of Agriculture for state benefit programs were illegally stolen from victim accounts in violation of Title 18, United States Code, Section 1029(a)(4), (b)(2) and (c)(1)(a)(ii).

## COUNT 3
(Conspiracy to Commit Identity Theft, 18 U.S.C. §§ 1028(a)(7) and (f))

The Grand Jury further charges:

88.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-27 of this Indictment.

89.     From on or about January 30, 2026 to on or about March 20, 2026, in the Northern District of Ohio and elsewhere, Defendants IONU ILIE aka IONUT DORABANTU,

16

aka MORGAN ANDERSON, aka IONUT CRACIUN-CERCEL, aka LUKAS HLADKY, aka FREDERIK JUHL; CONSTANTIN EVGEN ION aka PIRHANNA; VALENTIN VELICU aka GRASU, aka YANIS KARAGUNIS; DRAGOS GEORGHIE VASILE; and MARIAN ALEXANDRU SEMPLICAN, did knowingly combine, conspire, and agree with other persons known and unknown to the Grand Jury to transfer, possess, and use, without lawful authority, in and affecting interstate and foreign commerce, the means of identification of another person, to wit, the names, Social Security numbers, dates of birth, and state issued driver's license and identification numbers of others, with the intent to commit, and to aid and abet, and in connection with, any unlawful activity that constitutes a violation of Federal Law, to wit, conspiracy to commit wire and mail fraud, in violation of 18 United States Code, Section 1349, conspiracy to commit access device fraud in violation of Title 18, United States Code, Section 1029(b)(2), and aiding and abetting in the theft of government monies in violation of Title 18, United States Code, Sections 641 and 2.

All in violation of Title 18, United States Code, Sections 1028(a)(7) and (f).

COUNT 4
(Sale or Receipt of Stolen Government Monies, 18 U.S.C. §641 and 2)

The Grand Jury further charges:

90.    The United States Attorney re-alleges and incorporates by reference paragraphs 1-27 of this Indictment.

91.    From on or about January 30, 2026, to on or about March 20, 2026, in the Northern District of Ohio and elsewhere, Defendants IONU ILIE aka IONUT DORABANTU, aka MORGAN ANDERSON, aka IONUT CRACIUN-CERCEL, aka LUKAS HLADKY, aka FREDERIK JUHL; CONSTANTIN EUGEN ION aka PIRANHA; VALENTIN VELICU aka GRASU, aka YANIS KARAGUNIS; DRAGOS GEORGHIE VASILE; and MARIAN

17

ALEXANDRU SEMPLICAN, willfully and knowingly did steal and purloin funds, and access credentials for funds, provided from the United States Department of Agriculture for state benefit programs directed to qualifying individuals, and did willfully and knowingly aid and abet in the stealing and purloining, of a value exceeding $1,000, of the goods and property of the United States, in violation of 18 U.S.C. §§ 641 and 2.

COUNT 5
(Reentry of Removed Aliens, 8 U.S.C. §1326 (a)(1) and (b)(3))

The Grand Jury further charges:

92.  On or about March 23, 2026, in the Northern District of Ohio, Defendant IONUT ILIE aka IONUT DORABANTU, aka MORGAN ANDERSON, aka IONUT CRACIUN-CERCEL, aka LUKAS HLADKY, aka FREDERIK JUHL, an alien, was found the United States after having been removed therefrom on or about February 25, 2019, at or near John F. Kennedy Airport, New York City, New York, and was found in the United States again on or about October 20, 2022 in the United States of America and removed on or about February 24, 2023, from O'Hare International Airport, Chicago, Illinois, both times after having departed the United States while an order of exclusion, deportation, or removal was outstanding, and not having obtained the express consent of the Secretary of Homeland Security to reapply for admission to the United States; in violation of Title 8, United States Code, Section 1326(a) and (b)(3).

FORFEITURE

The Grand Jury further charges:

The allegations of Counts 1 through 4 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B), 1028(b)(5), 1029(C)(1)(C), and Title 28, United States Code, Section 2461(c). As a result of the foregoing offenses, Defendants IONU ILIE aka IONUT

18

DORABANTU, aka MORGAN ANDERSON, aka IONUT CRACIUN-CERCEL, aka LUKAS HLADKY, aka FREDERIK JUHL; CONSTANTIN EUGEN ION aka PIRANHA; VALENTIN VELICU aka GRASU, aka YANIS KARAGUNIS; DRAGOS GEORGHIE VASILE; and MARIAN ALEXANDRU SEMPLICAN shall forfeit to the United States and any property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts 1 and 4, or any property traceable to such property; any property, constituting, or derived from, proceeds obtained directly or indirectly as a result of the violation charged in Counts 2 and 3; and any personal property used or intended to be used to commit the violations charged in Counts 2 and 3.

## SUBSTITUTE ASSETS

If, as a result of any act or omission of Defendants, any property subject to forfeiture:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been comingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of Defendants up to the value of the forfeitable property described above.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.

19